## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, KANSAS; and ALEJANDRO RANGEL-LOPEZ, <br><br>    Plaintiffs, <br><br> vs. <br><br> DEBORAH COX, FORD COUNTY CLERK; in her official capacity, <br><br>    Defendant. | ) ) ) ) ) ) ) )   Case No. 2:18-cv-02572-DDC-TJJ ) ) ) ) ) ) |

### DEFENDANT'S RESPONSE TO PLAINTIFFS'
### MOTION FOR A TEMPORARY RESTRAINING ORDER

Defendant Deborah Cox, in her official capacity as the duly elected Clerk of Ford County, Kansas, respectfully submits the following Response to Plaintiffs' Motion for a Temporary Restraining Order and memorandum in support (Doc. 4 and 5).

### I. – Introduction

Despite the fact that Dodge City, Kansas has maintained the same election-day framework of a single polling place for all voters for more than *two decades*, Plaintiffs have filed a federal lawsuit demanding – *one week* before the upcoming general election – that this Court order the establishment of an additional polling location in the city. The current site, Plaintiffs contend, is not as convenient as the location used in prior elections and thus would have a disparate impact on the city's Hispanic community.

The factual predicate for Plaintiffs' last-minute suit is a wildly speculative theory that the temporary relocation of a polling place approximately 3.7 miles from its prior site will result in unspecified numbers of voters being unable to access the new venue due to poverty, lack of transportation, or other competing life or work obligations.

These claims are groundless and Plaintiffs' motion for a temporary restraining order is filled with patronizing arguments that are offensive to the residents of Dodge City.

The reality is that the drive from the previously used location – the Dodge City Civic Center – to the new/temporary location – the Western State Bank Expo Center – is no more than 5-10 minutes. For voters without access to a vehicle of their own who rely on public transportation, free door-to-door bus service is being provided that will literally pick up voters at their own homes and take them to the Expo Center on Election Day. In fact, the city has now expanded this free public transportation so that it will also take such voters – door-to-door from their homes and back – to the Ford County Government Center during the early in-person voting period (which runs through the day before the November 6 general election). This is in addition to all of the partisan and commercial organizing of free transportation to the polls. In a city of roughly only 7 miles by 10 miles, one of the easiest places to access in Kansas on Election Day may be the Expo Center. As for voters who do not like either of these easily accessible options, they can always vote by mail.

Plaintiffs have attempted here to elevate typical life vagaries and inconveniences to constitutional magnitude. Neither case law nor common sense support their claims. The Supreme Court has made it abundantly clear that such minimal burdens are simply not so serious or frequent as to raise any questions about their constitutionality. Plaintiffs' First and Fourteenth Amendments thus fall easily.

Plaintiffs' claim under Section 2 of the Voting Rights Act has no greater merit. Even assuming the temporary relocation of the Dodge City polling place to the Expo

Center has a disparate impact on eligible Hispanic voters – a contention that Defendant strongly disputes – the law is clear that mere disparate inconveniences do not violate the statute.  As the Fourth Circuit has noted,

> Every decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others.  For example, every polling place will, by necessity, be located closer to some voters than to others.  To interpret [Section] as prohibiting any regulation that imposes a disparate inconvenience would mean that every polling place would need to be precisely located such that no group had to spend more time traveling to vote than did any other. . . . Yet, courts have also correctly rejected that hypothetical.

*Lee v. Virginia State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016)

In short, Plaintiffs have come nowhere close to showing a likelihood of success on the merits of their claims.  To the contrary, their claims appear to be comprised of speculation and bluster, and they crumble at the touch.

But even if this Court were to find that Plaintiffs have shown a likelihood of success, relief at this incredibly late stage – the virtual eve of Election Day – would be administratively impossible to effectuate, introduce hopeless confusion into the electorate, and likely disenfranchise many of the same voters whose rights Plaintiffs claim to be protecting.  Plaintiffs' lawsuit is a recipe for disaster.  For all these reasons, Defendant respectfully requests that the Court deny Plaintiffs' motion for a TRO.

## II. Background and Facts

1.     Defendant Deborah Cox became the County Clerk in 2016.  Before that, starting in 2012, she worked as a Deputy Election Officer in the County Clerk's Office.  (Exhibit 1, ¶¶ 1-2).

2.      Since at least 1998, Dodge City has had a single polling place.  For the elections since then, the polling place has been the Dodge City Civic Center, which is now owned by the Dodge City Unified School District, USD 443.  (Exhibit 1, ¶¶ 3-4).

3.      Ms. Cox was notified on August 29, 2018 by USD 443 that there would be construction at the Civic Center starting in October 2018.  She was provided with a map that showed where construction was expected.  After reviewing it she believed the construction would begin with the parking lot being blocked off, hampering the main parking area for the Civic Center, and blocking off some of the handicap parking spots. Ms. Cox believed this could cause safety issues as well as congestion for parking and access to the building, particularly in the event of inclement weather.  (Exhibit 1, ¶ 5 and its Attachment A).

4.      Kansas Law requires at least 30 days' advance notice of any change in polling location.  K.S.A 25-2701(d)(1).  Although there was no way for Ms. Cox to be sure about whether the Civic Center would actually be under construction on Election Day, November 6, she had to make the best decision she could based on the information she had.  As a result, she immediately began looking for an alternative, temporary polling site for the November 2018 general election.  (Exhibit 1, ¶¶ 7-8).

5.      By September 11, 2018 Ms. Cox had decided that the best location would be the Western State Bank Expo Center.  It is owned and maintained by Ford County (including snow and ice removal if needed), meets all Americans with Disabilities Act ("ADA") requirements for a polling place, is a secure building with plenty of room for people to stand inside in case of inclement weather, provides plenty of parking near the

building (important if there is inclement weather on Election Day), is only a half mile from the city limits, has no competing events or crowds scheduled for Election Day, and is used for public events of all types on a regular basis. She believed the residents of Dodge City, including those in the Hispanic community, are very familiar with the Expo Center and its location. She has been advised that it is frequently used by those in the Hispanic community for events. (Exhibit 1, ¶¶ 8-9).

6.     She considered schools, but decided that heavy vehicle traffic around school start and ending times and lack of sufficient regular and handicap parking could pose challenges for such a location. She knew schools are currently being used in Kansas far less often as polling places than in years past. (Exhibit 1, ¶ 10).

7.     On September 28, 2018, Ms. Cox mailed notices of the polling location change to registered voters at the last address each had provided as part of their voter registration process. The notice, Attachment B to Exhibit 1, explained the location change for the November 6 election, outlined advance voting options and mail-in ballot options, explained that the change to the Expo Center was only because of the current construction at the Civic Center, encouraged people to vote, and noted the polling times at the Expo Center for November 6, 2018. (Exhibit 1, ¶ 11) . The letter also noted that the Expo Center would be used only for the November 6, 2018, general election, and that the Civic Center would remain the polling site for future elections.

8.     After Ms. Cox notified voters of the polling place change on September 28, she discovered that individuals who registered to vote from approximately that date through the registration deadline of October 16, received their Notice of Disposition

(i.e., voter registration postcard) indicating that their polling place was the Civic Center. There were 294 voters in Dodge City who received the notification through the postcard of their normal polling place.  As of the date of this filing, all of these voters have been mailed correspondence pointing out the temporary relocation of their polling place to the Expo Center. (Exhibit 1, ¶ 13).

9.     Some of the written notices were returned as undeliverable.  In most, if not all of those cases, it resulted from voters not notifying the Clerk's Office following a change in residence, as voters are required to do by K.S.A. 25-2316c(b).  The Clerk's office used the voters' last known addresses.  (Exhibit 1, ¶ 12).

10.     Dodge City again has cooperated with Ford County and is doing what it has done in past elections by offering free, door-to-door public transportation to voters that will take them directly to the Expo Center on Election Day.  Beginning about October 4, 2018, the city began posting signs (in both English and Spanish) advertising the free rides and also posted the notice of the free ride availability on the city's website (Exhibit 1, ¶ 14 and its Attachments C, D, and E).

11.     The city has also posted on its website as of October 23, and has released a press release since then, again highlighting in English and Spanish the free public transportation available to anyone who calls to schedule it, as well as the advance and mail-in voting options available during weekdays, weekday evenings, and on the Saturday before the election. (Exhibit 1, ¶ 15 and its Attachment F).

12.     Contrary to the allegations in the amended complaint about public transportation taking at least 60 minutes in each direction to get a voter from a centrally

located part of the city to the Expo Center and then forcing the voter to walk 1.3 miles from the bus stop to the Expo Center, the city's free transportation that day is directly to the door of the Expo Center, not a distant bus stop.  This was again publicized on October 29 by the Mayor of Dodge City, along with word that the city is also taking any voter who requests it door to door to the advance voting location (i.e., the city's Government Center) before the election. (Exhibit 1, ¶ 17 and Attachment G).

13.     Ms. Cox has already or is in the process of further publicizing the polling place change, the free public transportation, and advance and mail-in voting options in such media/social media locations as:  the Ford County website, The Dodge City Globe newspaper; the Dodge City La Estrella newspaper; and radio stations 92.9/101.5 La Mexicana, 93.9 The Buzzard, 96.3 The Marshall, 95.5/1470 Super Hits, Q97 and Z98, and 1370 KGNO.  The Dodge City Chat Facebook page has also discussed these issues extensively. (Exhibit 1, ¶ 16).

14.     Advance voting times have been well publicized in avenues such as those mentioned above.  Voters have been advised that advance voting is available not only by mail, but also early in person at the County Clerk's office at the Ford County Government Center, on October 18th and 19th from 9:00 am – 4:30 pm; October 22-26 from 9:00 am – 4:30 pm; October 29 from 9:00 am – 4:30 pm; October 30th from 9:00 am – 7:00 pm; October 31st from 9:00 am to 4:30 pm; November 1st from 9:00 am – 7:00 pm; November 2 from 9:00 am to 4:30 pm; Saturday, November 3rd from 10:00 am – 2:00 pm; and November 5th from 9:00 am – noon.  In addition, Dodge City has also offered free public transportation door-to-door for any voter wanting to ride to the Ford

County Government Center to participate in advance voting.  Mail in ballots can be obtained on or before October 30, 2018.  (Exhibit 1, ¶¶ 18-19).

15.     Many steps would have to be taken before Tuesday if another polling place were to be opened.  It is not possible for these to be completed before Election Day. (Exhibit 1, ¶ 22).

16.     In addition to these challenges to adding a new location at such a late time, the County Clerk's office is not large.  Ms. Cox has only one deputy, a worker who has only been on the job since September 2018.  She is being trained and this is her first election. Ms. Cox is responsible this week for the training of poll workers, continuing to oversee advance voting (which has been brisk) and handling the many other frenzied requirements of a county clerk the week before Election Day.  (Exhibit 1, ¶¶ 23-24).

17.     Ms. Cox has lived in Dodge City all of her life.  The trains are a daily part of life, and block different parts of town at various times.  People who live on the south side of the tracks often cross them to the north, and vice versa.  She personally worked on the south side of Dodge City for many years and routinely crossed the tracks on almost a daily basis without problems.  In addition, in the event a train would happen to block a road for a longer than usual amount of time, there are alternate under/over passes that can be used to go from north to south and vice versa.  (Exhibit 1, ¶ 20).

18.     Ms. Cox's plan is to have a second polling location for Dodge City no later than the next large-volume election in 2020, if not by 2019.  (Exhibit 1, ¶ 21).

### III. – Legal Standard Governing Requests for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the movant is entitled to such relief." *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1245-46 (10th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) (internal quotation marks omitted). This well-established standard requires that the movant meet four separate factors:  (1) he is substantially likely to succeed on the merits; (2) he will suffer irreparable injury if the injunction is denied; (3) his threatened injury outweighs the injury that the opposing party will suffer under the injunction; and (4) the injunction will not be adverse to the public interest.  *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016).  Because this remedy is so extraordinary, it will only be awarded if the movant's right to relief is clear and unequivocal.  *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016).

Furthermore, certain preliminary injunctions are disfavored and thus require an even stronger showing by the movant.  *Fish*, 840 F.3d at 723.  These include (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.  *Id.* at 723-24.  In light of Plaintiffs' requested relief here, this case falls squarely into all three of these categories, thereby heightening their burden.  Any injunction would certainly alter the status quo given that the polling location for next week's election in Dodge City has been identified and communicated (repeatedly and in many different forms) to all voters since late September 2018.  The relief sought (establishment of an additional polling place) is also

9

a mandatory injunction. *See O Centro Espirita Beneficientre Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 979 (10th Cir. 2004) (en banc) (mandatory injunctions "affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.")  And the injunction Plaintiffs seek would award them all the relief they have requested.  Accordingly, Plaintiffs must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms. *O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 975-76.

### IV. – Argument

#### A. – *Plaintiffs are not substantially likely to prevail on the merits*

Plaintiffs predicate their pursuit of relief on two discrete federal causes of action: (i) an alleged infringement on the right to vote of the Hispanic population in violation of the First and Fourteenth Amendments; and (ii) a purported unlawful voting process that disproportionately affects the Hispanic community in contravention of Section 2 of the Voting Rights Act.  Both claims are devoid of merit.

##### 1. – *First/Fourteenth Amendment Claim*

Our constitutional framework confers broad power on the States to "prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' which power is matched by state control over the election process for state offices." *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (quoting both U.S. Const., art. 1, § 4, cl. 1; and *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)).  When a state invokes this authority and carries out its obligation to regulate elections to ensure that they are

10

fair and orderly, the resulting restrictions will "inevitably affect – at least to some degree – the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). These burdens "must necessarily accommodate a state's legitimate interest in providing order, stability, and legitimacy to the electoral process." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018). That is why a state's "important regulatory interests are generally sufficient to justify reasonable, non-discriminatory restrictions" on election procedures. *Anderson*, 460 U.S. at 789.

There is "no 'litmus-paper' test that will separate valid from invalid restrictions." *Id.* The Court instead applies a "more flexible standard." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Under this flexible approach, referred to as the *Anderson/Burdick* balancing test, a "court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Cox*, 892 F.3d at 1077 (quoting *Burdick*, 504 U.S. at 434)).

Although flexible, this balancing test does contain certain core guidelines. If a state imposes "*severe* restrictions on a plaintiff's constitutional rights (here, the right to vote), its regulations survive only if 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. 434 (emphasis added). But "minimally burdensome and nondiscriminatory regulations are subject to a less-searching

examination closer to rational basis and the State's important regulatory interests are generally sufficient to justify the restrictions." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (citing *Burdick*, 504 U.S. at 434). "Regulations falling somewhere in between – i.e., regulations that impose a more-than-minimal but less-than-severe burden – require a 'flexible' analysis, weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Id.* (quotation omitted). Lurking in the background at all times, however, is the fundamental principle that "states have wide latitude in determining how to manage their election procedures." *ACLU v. Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008).

> a. – *Expo Center Polling Location Does Not Impose Substantial Burden on Voters*

The first element of this test, the magnitude of the burden imposed on voters, "is a factual question on which the plaintiff bears the burden of proof." *Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 703 (9th Cir. 2018) ("DNC"). Plaintiffs' brief is replete with highly generalized statistics (and unsubstantiated conclusions drawn therefrom) about the poverty rate in Dodge City (slightly above the national average), vehicle ownership percentages (roughly in line with the rest of Kansas), high rate of carpooling (which has historically been characterized as a *good thing* and an environmentally conscious practice), supposed concentration of the workforce in low-wage service and manufacturing industries (unsupported by any evidence and likely contrary to fact inasmuch many of the businesses that Plaintiffs malign pay quite well on a relative basis), and the "*potential*" need for public transportation by the city's non-disabled and non-elderly population. Br. at 4-5. None of these statistics is in any way probative of

Plaintiffs' argument that the use of the Expo Center as the city's temporary polling place for the November 2018 general election is unconstitutional.

Plaintiffs maintain that the greater distance of the new polling location from the previously-used site will force voters to travel, on average, twice as far to vote.  It is not at all clear how Plaintiffs derive this figure.  In fact, the all-important "distance between Top 5 Major Employers and Civic and Expo Centers" exhibit that Plaintiffs trumpet in their brief suggests that, with only one exception, the major employers in Dodge City are either closer to, or only slightly further away from (within 0.3 to 2.7 miles), the Expo Center than they were to the Civic Center.  Br., Exhibit B.  Ultimately, the point is irrelevant.  One person's convenience is another's inconvenience.  Minimal burdens that might flow from generally applicable, non-discriminatory voting regulations simply do not offend the Constitution.  *Burdick*, 504 U.S. at 434; *Ohio Democratic Party*, 834 F.3d at 631.  The intrusion on state and local sovereignty were the law otherwise would be extraordinary.

Plaintiffs' contention (Br. 11-12) that *any* inconvenience to a voter must be justified by a substantial state interest has the law exactly backwards.  Indeed, the Supreme Court rejected this position categorically in *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008).  Evaluating a constitutional attack on Indiana's photo ID requirement, the Court there held that the burden on voters of going to the Bureau of Motor Vehicles to obtain an ID in order to subsequently be able to vote at a polling place was no more burdensome than the usual challenges of voting.  *Id.* at 198-99.  As the Court pointed out:

> The "inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not . . . even represent a significant increase over the usual burdens of voting," *even though* "a somewhat heavier burden may be placed on a limited number of persons" including the elderly, the economically disadvantaged, and the homeless.  *Id.*

In fact, the Court also made clear that, in the context of *Anderson/Burdick* analyses of voting laws, it is improper even to consider whether a neutrally applicable restriction has a heavier impact on certain subgroups in the community in the absence of *quantifiable* evidence as to how that subgroup's characteristics makes it more likely they will be disenfranchised as a result of those provisions.  *Id.* at 199, 200-03; *accord DNC*, 904 F.3d at 703; *Ohio Democratic Party*, 834 F.3d at 630-31.

The Sixth, Seventh, and Ninth Circuits have recently turned back highly similar constitutional challenges on this very ground as well.  *See DNC*, 904 F.3d at 702-710 (requirement that voters cast their ballots in their assigned precinct, and corresponding criminal prohibition on third-parties from collecting early ballots from voters, does not contravene the Constitution despite purported burden on Native Americans who lack home-mail service); *Ohio Democratic Party*, 834 F.3d at 626-35 (modification to Ohio's early voting rules was not constitutionally infirm, despite African-American groups' greater reliance on those measures); *Frank v. Walker*, 768 F.3d 744, 745-751 (7th Cir. 2014) (voter ID requirement is constitutional notwithstanding that fewer minorities possess such an ID).[1]

Plaintiffs suggest that Dodge City's relocation of the polling place for the

---

[1] Plaintiffs' citation (Br. 12) to *Ohio State Conference of the NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014), for a contrary position is ironic given that the Supreme Court promptly stayed that decision upon the State's application, 135 S. Ct. 42 (2014), and the Sixth Circuit later vacated the ruling as moot.  2014 WL 10384647 (6th Cir. Oct. 1, 2014).

November 2018 general election to a location a mere 3.7 miles from the site previously used "makes it effectively impossible for a person to vote on Election Day if they are scheduled to work on [that day]." Br. 12.  They claim that voters in low-wage industries and other low-income voters will be particularly adversely impacted.  The condescension underlying this point is staggering.  The polls on Election Day will be open for 12 hours – from 7:00 AM to 7:00 PM.  The city has made free bus service available on Election Day that will pick voters up from their home or workplace and drive them to the polling place and back.  If, for some reason, voters still choose not to drive, carpool, or take the free public transportation to the Expo Center, then they can vote by mail or early in-person on any weekday from 9:00 AM to 4:30 PM until November 5 (and from 10:00 AM to 2:00 PM on Saturday, November 3), at the Ford County Government Center, which is situated right in the middle of the city and one block from the main transportation hub.[2]  Defendant is even making available free, door-to-door bus service available to the Government Center for early in-person voting.  Yet Plaintiffs seem to be projecting a concept that every low income citizen is simply too helpless to cast a ballot in this election.  It is insulting to the residents of Dodge City.

Furthermore, the legal jurisprudence on this issue undermines Plaintiffs' case.  As the Supreme Court noted in upholding Indiana's voter ID requirement, "burdens arising from life's vagaries are neither so serious nor so frequent as to raise any questions about the constitutionality of [the challenged law]." *Crawford*, 553 U.S. at 197;

---

[2] Defendant would note as an aside that, only through significant contortions of the law could the lack of public transportation to polling locations in rural communities like Dodge City, Kansas be considered a violation of voters' First and Fourteenth Amendment rights.  If such a theory is embraced, federal courts will soon be overwhelmed with these type of claims.

*accord DNC*, 904 F.3d at 705-06; *Ohio Democratic Party*, 834 F.3d at 630-31; *Frank*, 768 F.3d at 749. Nearly everyone has busy lives and competing commitments. Juggling those obligations can be a difficult task at times for anyone. The need to do so, however, does not have constitutional ramifications.

Ironically, the named Plaintiff in this lawsuit, Mr. Rangel-Lopez, acknowledges in his affidavit that he will have no difficulty voting on Election Day because, like countless other similarly situated Americans, he plans to take time off from his after-school job to go vote. Br., Exhibit D at ¶ 9. That is hardly an unconstitutional burden. Mr. Rangel-Lopez also concedes that he confronts no real impediments to voting early via mail or in person at the county election office. *Id.* at ¶ 10. But he claims he does not *want* to do so because he is afraid his vote might not be counted (a point so absurd that it does not merit a response) and he would lose his sense of community from voting on Election Day. *Id.* With all due respect, these are just the type of "life vagaries" that the Supreme Court has clearly held do not amount to a legally cognizable burden under the Constitution. *Cf. Frank*, 768 F.3d at 749 ("If people who already have copies of their birth certificates do not *choose* to get free photo IDs, it is not possible to describe the need for a birth certificate as a legal obstacle that disenfranchise them."); *DNC*, 904 F.3d at 706 ("idiosyncratic circumstances" of certain individuals are not evidence of severe burden on an identifiable subgroup of voters).

The Sixth Circuit perhaps said it best in rejecting a similar argument that *voter preferences* could support a challenge to an otherwise non-discriminatory voting law (in that case, a constitutional attack on restrictive changes to Ohio's early voting rules). The

court noted:

> The district court placed inordinate weight on its finding that some African-American voters *may prefer* voting on Sundays, or avoiding the mail, or saving on postage, or voting after a nine-to-five work day.  To the extent [the Ohio law] may be viewed as impacting such preferences, its "burden" clearly results more from a matter of choice rather than a state-created obstacle.  The Equal Protection Clause, as applied under the *Anderson-Burdick* framework, simply cannot be reasonably understood as demanding recognition and accommodation of such variable personal preferences, even if the preferences are shown to be shared in higher numbers by members of certain identifiable segments of the voting public.
> *Ohio Democratic Party*, 834 F.3d at 630 (citing *Frank*, 768 F.3d at 749).

Recognizing the legal hurdles they face in the wake of the case law set forth above, Plaintiffs cling to several easily distinguishable cases.  The first, *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc), struck down a Texas voter ID statute under Section 2 of the Voting Rights Act.  According to the court, however, the state *failed to contest any evidence* of the claimed burden of the voter ID requirement other than to suggest that individuals could vote by mail.  *Id.* at 255.  Included in that evidence were multiple individuals for whom it was apparently impossible to obtain the requisite ID, and yet who were turned away when they attempted to vote and never offered a provisional ballot in an attempt to resolve the issue.  *Id.* at 254.  In short, that case is nothing like what is at issue here.

Plaintiffs additionally rely on two district court opinions – *Common Cause Ind. v. Marion Cnty. Election Bd.*, 311 F. Supp.3d 949 (S.D. Ind. 2018), and *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp.3d 896 (W.D. Wis. 2016) – both of which are now on appeal before the Seventh Circuit and both of which are of dubious precedential value.[3]  In *Common*

---

[3] The *Common Cause Indiana* appeal is No. 18-2735, and the *One Wisconsin Institute* appeal is No. 16-3083.

*Cause Indiana*, the plaintiffs challenged the county election board's decision to close various early in-person absentee voting centers that had been used almost a decade before. 311 F. Supp.3d at 954-56. For some inexplicable reason – political or otherwise – the board *expressly waived* its right to contest whether the plaintiffs had established a constitutional violation. *Id.* at 961. Although noting the absence of quantifiable evidence of a burden on voters from the closure of these centers (as *Crawford* requires), the district court nevertheless found that the board's actions were motivated by partisanship and thus ordered that the satellite early voting centers be reopened. *Id.* at 974-76. Even then, though, the court refused to order that the centers be reopened in time for the election that was scheduled for *ninety days* hence because such a move would lead to "last–minute upheaval and confusion in the administration" of that election. *Id.* at 976.

Meanwhile, the court in *One Wisconsin Institute* struck down a state statute in large part that limited municipalities to a single location for in-person voting. 311 F. Supp.3d at 931-35. The court seemed to pay little more than lip service to the need for deference to state officials in the context of election administration, and largely ignored the teachings of the Seventh Circuit's *Frank* opinion. It characterized the legislature's justifications for the bill as entirely "illusory." *Id.* at 934-35. The holding came as little surprise given the judge's criticism at the outset of his opinion of the Supreme Court's *Crawford* decision and the Seventh Circuit's subsequent *Frank* ruling. *Id.* at 903. In any event, the case is of no utility to Plaintiffs in the instant action given that the district court there expressly declined to order any relief for the primary election that was

approximately one week away. *Id.* at 905.

Legally speaking, the bottom line is that if the Supreme Court has held that the inconvenience of going to the county registrar's office to obtain an ID card does not impose a substantial burden, then surely the burden of *potentially* having to endure a passing train over the lunch hour, driving 5-10 extra minutes to a new polling location, or calling the transportation department and requesting a pick-up by the free door-to-door bus service the city has arranged to take voters to and from the polling place on Election Day, is mightily minimal.

Plaintiffs have grossly distorted reality by painting Dodge City as a bleak community of uneducated and helpless residents.  Nothing could be further from the truth.  Whatever minor inconveniences may exist with the Expo Center as a polling location, both Defendant and Dodge City have gone to great lengths to more than accommodate those potentially impacted thereby.  No one will be prevented from voting, or face significantly greater obstacles than they might have encountered before, during this election cycle.  This Court should see right through the Plaintiffs' ruse.

> b. – *Defendant's Rationale for Relocating Polling Location Warrants Judicial Deference*

Defendant selected the Expo Center as the polling place for the November 2018 general election because she was advised in late August by USD 443 (the Dodge City School District) that the previously used site – the Civic Center – would be undergoing construction starting in October.  Ms. Cox was given a map detailing the geographical scope of the construction. *See* Exhibit 1, ¶ 5 and its Attachment A.  As Ford County's duly elected clerk and chief election officer, she had to use her best judgment at that

point as to whether the Civic Center would still be safe and accessible for all voters – in potentially inclement weather – on Election Day. She concluded that it would not be.

This decision is entitled to respect and should not be second-guessed by this Court. Construction schedules are inherently fluid but the only thing Defendant had to go by in late August was the stated time frame and map provided to her by Mr. Hammond. Moreover, if there were to be snow or ice on the ground on November 6, the likelihood of injuries at that location could be significant given the much greater distance voters may have to walk from their parking spots due to the construction and associated fencing. As it is, the Civic Center map provided by USD 443 shows that it technically does not even meet the ADA voting accessibility guidelines.[4] The guidelines require at least four ADA accessible parking stalls for every 100 standard stalls, and the Civic Center – once construction commences – will only have (at most) 18 for the 519 total stalls. *See id.*

Defendant also chose the Expo Center because, although its location is not ideal for some voters, it is a secure, county-owned facility (thereby requiring no negotiations with interested parties) that meets all of the ADA accessibility requirements. It is maintained by the county so any snow or ice on Election Day will be promptly removed without concern. The venue is also less than a mile from the Dodge City limits and is

---

[4] Plaintiffs attach great significance to the fact that other events are still planned at the Civic Center during the week of Election Day and in the weeks thereafter. Br. 15. As an initial matter, upon information and belief, those events were scheduled well in advance of the recently announced construction timetable. More importantly, though, those events are of a significantly different nature than a polling place and will have far less need for the exclusivity, accessibility, parking, and safety guarantees that will be critical on November 6. In addition, those events – if they are still to occur – will attract exponentially fewer attendees than the voters heading to the polls on Election Day.

extensively used by the public – including, quite regularly, by the Hispanic community for birthdays, weddings, and other events – and thus residents are very familiar with it. In contrast to many other potential facilities, the Expo Center has abundant parking – both accessible and standard – that is very close to the building.  Meanwhile, there are no competing events there on Election Day that might impede the heavy flow of voters going in and out of the building.

Although Plaintiffs insist, with bellicose rhetoric, that Defendant could and should have chosen a more convenient location than the Expo Center,[5] the Supreme Court has expressly declined to require that restrictions imposing minimal burdens on voters' rights must be narrowly tailored.  *Burdick*, 504 U.S. at 433; *DNC*, 904 F.3d at 709. Plaintiffs' assertion that there may be less restrictive measures or options that are more convenient or efficient is of little or no relevance as a matter of constitutional law.  *DNC*, 904 F.3d at 709 (citations omitted).

### 2. – Section 2 of the Voting Rights Act Claim

Plaintiffs further claim that the use of the Expo Center as a polling place in the upcoming election contravenes Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, by disproportionately harming Hispanic voters, who now must travel further in order to vote as compared to their white counterparts.  Compl., ¶ 31.  Plaintiffs argue that this disproportionate harm is attributable to the fact that Hispanics (a) are less likely to have

---

[5] Plaintiffs argue that Defendant should have chosen one of the schools in Dodge City as an alternative rather than the Expo Center.  But schools are hardly ideal for a polling place given (i) the heavy traffic and limited parking during parts of the day when children are coming and going, (ii) the potential for voters to be wandering throughout the school building, thereby disrupting students and teachers, and (iii) the absence of accessible parking, notwithstanding Plaintiffs' unsupported contention to the contrary.  Indeed, schools in Kansas increasingly decline to serve as polling places.

access to a vehicle, (b) have lower incomes, and (c) work in industries with less flexible schedules. *Id.* at ¶ 32. This claim is likewise bereft of any merit.

As amended, Section 2 of the Voting Rights Act provides as follows:

(a)    No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b)    A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population

Although there is an abundance of case law interpreting Section 2 in the context of vote dilution cases, epitomized by the Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30 (1986), there has been no conclusively established standard for evaluating vote denial claims under this section. *Ohio Democratic Party*, 834 F.3d 637. What is clear, though, from the text of the statute is that the mere existence of a disparate impact of any voting practice or procedure is *not* sufficient to establish a cognizable and remediable claim under Section 2. *Id.* Because the focus in a Section 2 challenge is whether minorities have less opportunity to elect the candidate of their choice, "evidence that a particular election practice falls more heavily on minority voters, or that electoral outcomes are not proportionate to the numbers in the

populations, is not sufficient by itself to establish a Section 2 violation." *DNC*, 904 F.3d at 713. Instead, Plaintiffs bear a much heavier burden of showing a "causal connection between the challenged voting practice and a prohibited discriminatory result, i.e., less opportunity to participate in the electoral process and elect representatives." *Id.* (citation omitted). If a disparate impact alone was sufficient to make out a violation of Section 2, the statute would "dismantle every state's voting apparatus." *Frank*, 768 F.3d at 754.

This is why, for example, the Seventh Circuit quickly rejected a Section 2 attack on Wisconsin's voter ID statute, even though the evidence in the case indicated that minority voters had significantly lower rates of ID ownership than whites. *Id.* The court noted that Section 2 must be understood "as an equal-treatment requirement (which is how it reads) [rather] than as an equal-outcome command." *Id.* Similarly, the Fourth Circuit held in *Lee*, 843 F.3d at 598-601, that the voter ID requirement in Virginia did not violate Section 2 despite the fact that far more minorities lacked access to IDs than non-minorities. The Fourth Circuit's analysis is quite apropos of the facts at issue here:

> [P]laintiffs press their argument further, asserting categorically that as long as there is disparity in the rates at which different groups possess acceptable identification, § 2 is violated. To make this assertion, however, the plaintiffs have to make an unjustified leap from the <u>disparate inconveniences</u> that voters face when voting to <u>the denial or abridgement of the right to vote</u>. *Every decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others. For example, every polling place will, by necessity, be located closer to some voters than to others. To interpret § 2 as prohibiting any regulation that imposes a disparate inconvenience would mean that every polling place would need to be precisely located such that no group had to spend more time traveling to vote than did any other.* Similarly, motor-voter registration would be found to be invalid as members of the protected class were less likely to

possess a driver's license. Yet, courts have also correctly rejected that hypothetical.

We conclude that § 2 does not sweep away all election rules that result in a disparity in the convenience of voting. As we noted in *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016), "it cannot be that states must forever tip-toe around certain voting provisions" that would have more effect on the voting patterns of one group than another. Rather, § 2 asks us to evaluate whether the Virginia process has diminished the opportunity of the protected class to participate in the electoral process. If Virginia had required voters to present identifications without accommodating citizens who lacked them, the rule might arguably deprive some voters of an equal opportunity to vote. But where, as here, Virginia allows everyone to vote and provides free photo IDs to persons without them, we conclude that [the voter ID law] provides every voter an equal opportunity to vote and thus does not violate § 2 of the Voting Rights Act.

*Id.* at 600-01 (italicized emphasis added) (internal citations omitted).

If, and only if, the causal connection described above can be established, then the plaintiff can proceed to the next step and attempt to prove that, under the totality of the circumstances, the voting practice or procedure "has the effect, as it interacts with social and historical conditions, of causing racial inequality in the opportunity to vote." *Ohio Democratic Party*, 834 F.3d at 638. But it is important to understand that Section 2 is still not implicated just because a racial group has suffered historical discrimination and thus may find itself at an indirect disadvantage in connection with a voting practice or procedure. As the Sixth Circuit explained:

[T]he second step asks whether the alleged disparate impact is in part caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class. Read in isolation, this formulation of the second step could be erroneously understood to mean that an alleged disparate impact that is linked to social and historical conditions makes out a Section 2 violation. But if the second step is divorced from the first step requirement of causal contribution by the challenged standard or practice itself, it is

incompatible with the text of Section 2 and incongruous with Supreme Court precedent.  Thus, the second step asks not just whether social and historical conditions "result in" a disparate impact, but whether the challenged *voting standard or practice* causes the discriminatory impact as *it* interacts with social and historical conditions.

*Ohio Democratic Party*, 834 F.3d at 638 (internal quotations omitted).

Some courts, in fact, have questioned how much utility this second step even has. Indeed, the Seventh Circuit underscored that "units of government are responsible for their own discrimination, but not for rectifying the effects of other persons' discrimination."  *Frank*, 768 F.3d at 753.  In other words, even if a minority group has been subjected to historical discrimination, unless a plaintiff can specifically tie the challenged voting law or practice to discrimination committed by the governmental body at issue, Section 2 is not violated.[6]  *Id.* at 755.

In the case at bar, Plaintiffs fall far short of the mark in establishing a likelihood of success on their Section 2 cause of action.  Other than the most general statistics about the Hispanic population in Dodge City and its poverty rate compared to non-Hispanics,[7] Plaintiffs have offered no quantifiable evidence about the purported burden Hispanics will suffer from the transfer of the polling location 3.7 miles south from its former location for the November 2018 election.  As a result, Plaintiffs come nowhere close to satisfying the first prong of the Section 2 test.  It is not even clear that Plaintiffs are able to show that the use of the Expo Center will have a disparate impact on the

---

[6] The term "minority group" is a bit misleading here inasmuch as it is well settled that Section 2 also protects the rights of white voters, particularly when they are in the minority in a jurisdiction.  *See United States v. Brown*, 561 F.3d 420, 434 (5th Cir. 2009).

[7] The utility of these population statistics is even more questionable since, according to the Census Bureau's American Community Survey for 2012-2016, more than 23.5% of the Dodge City population is comprised of non-U.S. citizens.

Dodge City Hispanic community, let alone that such location will provide the Hispanic community with less opportunity to participate in the electoral process.

In sum, the establishment of a temporary polling place for the 2018 general election at the Expo Center has no racial connections. It is equally open to all voters. And particularly in light of all the accommodations the city has made available to help voters get to the polling place on Election Day, all voters clearly have an equal opportunity to get to the site. When one also throws in the myriad alternatives offered for voting early or via mail, under no reasonable interpretation of the law can the location of the new polling site for this election be deemed to contravene Section 2.

### B. – Plaintiff's threatened injury does not outweigh the injury to Defendants and the public

Even if the Court determines that one or more of Plaintiffs' causes of action show a likelihood of success on the merits, a preliminary injunction would still be wholly inappropriate here due to the imminence of the November 6 general election and the adverse impact such relief would have on the Defendant's ability both to administer the election and comply with applicable federal and state laws.

The Supreme Court has consistently directed lower courts to exercise significant caution and restraint before ordering any changes to a state's election procedures on the eve of an election. The Court has observed that such "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As the election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam); *id.* at 5-6 (vacating stay of injunction against enforcement of voter ID requirements issued by lower court less

than five weeks before election).  Requests for any sort of injunctive relief that would change election law in close proximity to an election are met with extreme skepticism and nearly *always* rejected.  *See Veasey v. Perry*, 769 F.3d 890, 894-95 (5th Cir. 2014) (cataloguing Supreme Court cases).

Courts' rigorous enforcement of what has come to be known in election law circles as the *Purcell* doctrine has grown even stronger in recent years, particularly in the context of voting rules and the machinery of the election-day process.  *See, e.g., Crookston v. Johnson*, 841 F.3d 396, 398-401 (6th Cir. 2016) (vacating injunction issued by district court less than one week before election against polling place rules).  "Call it what you will – laches, the *Purcell* principle, or common sense – the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so."  *Id.* at 398. There is a very strong interest in the orderly and effective administration of voting laws. Changing rules and processes at the last minute inevitably will precipitate substantial confusion among poll workers and voters.  *SEIU Local 1 v. Husted*, 698 F.3d 341, 345-46 (6th Cir. 2012).  This must be avoided at all costs.

The relief that Plaintiffs seek – the opening of a new polling site for the November 6 election that is *less than a week away* – would be administratively *impossible* to put in place, would require Defendant to violate state election laws to implement at this stage, and would create such voter confusion and chaos that it would inevitably lead to a diminution of voter turnout and potential disenfranchisement of the very individuals whose rights Plaintiffs purport to be protecting.

If the Court were to order such relief, each of the following steps, *inter alia*, would have to be taken, which simply cannot be humanly done prior to next Tuesday:

- Choose a suitable location that is safe and secure and then negotiate agreement or contract with the owner of the facility.  The venue must be available from the early morning to late at night and there can be little or no other activities going on that would interfere with the voting process and the sizable number of voting going in and out all day;

- Ensure that the location meets all of the Americans with Disabilities Act (ADA) comprehensive accessibility requirements, which are extremely rigorous and aggressively enforced by the U.S. Department of Justice's Civil Rights Division.  *See* https://www.ada.gov/votingck.htm; *see also* Exhibit 2.  Adequate parking for the disabled is critical in this regard; many sites may have adequate sites for certain purposes, but not enough for polling places, which tend to require more due to the substantially heavier use by the disabled on Election Day.  *See* https://www.ada.gov/votingchecklist.pdf.

- Recruit, hire and train additional poll workers to staff the new location.  In this vein, there must be a sufficient number of bilingual poll workers for the new site in light of the county's coverage under Section 203 of the Voting Rights Act.  In light of K.S.A. 25-2908(c)'s mandate that every polling place have at least two individuals to read the name and repeat the name of each voter, a new site would also absolutely necessitate the hiring of more poll workers.  After all, there would no longer be any economy of scale for this statutory function;

- Reprogram the voter registration database (ELVIS) to determine which voters should be assigned to the new location and what ballots they should receive.  Ford County has 34 ballot styles for the upcoming election, tied to the precinct in which the voter resides;

- Reprogram poll pads (i.e., electronic poll books that has all voter registration records and precinct information), which are also set to polling locations and ballot styles;

- Reprogram the ADA / Help America Voting Act (HAVA) voting  machines, which are designed for blind voters and are also tied to the precinct in which the voter resides;

- Order new paper ballots (for provisional ballots) that meet all of the conditions set forth above;

- Publicize the change in the polling place. This requirement would be further complicated by the fact that The Dodge City Daily Globe does not even publish on Mondays and the La Estrella paper publishes only on Thursdays;

- Notify all affected voters of the change in their polling location. This, in itself, is an impossibility inasmuch as state law requires that election changes must be communicated at least 30 days prior to the election. *See* K.S.A. 25-2701(d)(1).

- Print signage for the new polling place – in both English and Spanish. (Exhibit 1, ¶ 22).

There are probably at least a dozen other preparatory steps that this list overlooks. These steps simply cannot be done in time for the upcoming election. Indeed, it took the Defendant and her staff *a week* just to stuff the envelopes when she sent out notices to voters on September 28 of the change in polling location to the Expo Center. And it is not as if Defendant has no other work to do this week in preparing for this major election. Nor does she have a staff (other than a single election deputy, who just started in September) to whom she can delegate key tasks.

Plaintiffs naively argue that opening up a new polling location would entail little more than shifting certain personnel and voting machines to the new site. But that could cripple operations and lead to massive lines. Even if one were to suspend reality and assume that all the steps listed above could be completed in the next few days, Defendant would not know how many voters would show up at each location. After all, Dodge City has operated only a single polling place on Election Day for more than twenty years and additional poll workers cannot simply be reallocated throughout the day. Plus, under Kansas election law, voters must be assigned to a specific polling place

and cannot simply vote on Election Day at any site in the county or city that they choose.  *See* K.S.A. 25-2702 (effectively prohibiting establishment of election centers).

Moreover, if problems arise, Defendant would have to shuttle back and forth between the locations, which could further exacerbate confusion and tensions at one site or the other.  The harm to the Defendant and the public at large (including, of course, potential voters) is almost impossible to overstate.  In short, Plaintiffs' proposed remedy is completely unworkable and a recipe for disaster.  It must be rejected.

## IV. – Conclusion

For the foregoing reasons, Defendant respectfully requests that the Court deny the Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

Respectfully Submitted,

By: /s/ Bradley J. Schlozman
Bradley J. Schlozman (KS Bar #17621)
Mitchell L. Herren (KS Bar #20507)
Jeffrey M. Kuhlman (KS Bar #26865)
HINKLE LAW FIRM LLC
1617 North Waterfront Parkway, Suite 400
Wichita, KS 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: mherren@hinklaw.com
E-mail: jkuhlman@hinklaw.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I certify that on October 30, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the e-mail addresses on the electronic mail notice list, including counsel for the Plaintiff.


By: /s/ Bradley J. Schlozman